UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| DARRELL RADSON, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    Case No.    18-cv-1374-CSB-EIL |
| | ) |
| BRADLEY UNIVERSITY, | ) |
| | ) |
|     Defendant. | ) |

**Sworn Declaration of Darrell Radson**

On his oath and under penalty of perjury, the affiant, Darrell Radson, states as follows:

1. I am the Plaintiff in this proceeding.

2. On December 14, 2011, I was offered the position of Dean of the Foster College of Business. At that time my annual salary was set at $275,000 (App. 1).[1]

3. On or about March 12, 2013, I signed a contract for the 2013-2014 academic year that ran from June 1, 2013, through May 31, 2014. My annual salary for that period was $275,000 (App. 2).

4. On or about March 20, 2014, I signed a contract for the 2014-2015 academic year that ran from June 1, 2014, through May 31, 2015. My annual salary for that period was $275,000 (App. 3).

5. On or about March 31, 2015, I signed a contract for the 2015-2016 academic year that ran from June 1, 2015, through May 31, 2016. My annual salary for that period was $275,000 (App. 4).

6. On or about March 11, 2016, I signed a contract for the 2016-2017 academic year that ran from June 1, 2016, through May 31, 2017. My annual salary for that period was $279,815 (App. 5).

7. On or about March 20, 2017, I signed a contract for the 2017-2018 academic year

---

[1] The reference to "App. __" is a reference to the appendix attached to this affidavit.

that ran from June 1, 2017, through May 31, 2018.  My annual salary for that period was $284,710 (App. 6).

8. On January 26, 2018, I was notified by Provost Zakahi and President Roberts that I was immediately being removed from my position as Dean of the Foster College of Business (App. 7).

9. The letter that they provided to me indicated that I would continue working as a faculty member for Bradley and would be paid $158,570 for the 2018-2019 academic year (App. 7).

10. The removal letter indicated that I would be paid at the faculty rate for the months of June, July, and August 2018 (App. 7).  That never happened and I was not paid for those dates.

11. On July 19, 2018, I entered into an agreement with Bradley under which I would be paid $158,570 for the 2018-2019 school year (App. 8).

12. After being notified that I was removed from my position as Dean of the Foster College at Bradley, I immediately began seeking comparable employment with other universities.  I worked with recruiters and applied for many different positions.

13. On September 18, 2018, I entered into an agreement with Benedictine University to serve as the dean of the Daniel L. Goodwin College of Business effective January 1, 2019 (App. 9-11).

14. Under the terms of the agreement I entered into with Benedictine, my salary was set at $225,000 annually (App. 9).

15. On October 4, 2018, I notified Bradley University that I had accepted the position at Benedictine and that I was seeking to resign my position at Bradley effective December 31, 2018 (App. 12).

16. On October 4, 2018, Bradley University accepted my resignation (App. 14).

17. Had I remained as the Dean of the Foster College I would have earned $284,710 for 2018.

18. I ultimately earned $178,092.92 from Bradley University for the work that I did for it in calendar year 2018.  This number is based upon the following calculations:

      Dean Salary (284,701) x  5 Months = $118,629.17
      Faculty Salary (158,570) x   4.5 months = $59,463.75
                                 **Total = $178,092.92**

19. As part of the appendix I have attached my 2018 income tax return (App. 21-22) and my w-2 from Bradley for that year (App. 23).  Because of the way that Bradley pays, it is somewhat confusing.  In early 2018 I was paid for work that I had actually done in the waning months of 2017.  I have also attached my pay stubs I received for 2018 (App. 45-54).  My final paystub indicates that I received $171,485.83 (App. 54).  My w-2 indicates that I received $184,915.39 (App. 23). Both of these numbers are slightly misleading because of the way that Bradley pays.  This is further established by the fact that I received a w-2 from Bradley for 2019 despite the fact that I did not actually work at Bradley in 2019 (App. 27).

20. Ultimately, regardless of when it was received, my income from the work that I did for Bradley in 2018 was $178,092.92.

21. Had I been employed as the Dean of the Foster College at Bradley I would have reasonably earned $284,710.  This figure assumes that my salary would not have increased.  As a result of my removal as Dean, my loss in income for 2018 was $106,617.08.

22. In 2019, as outlined above, I worked at Benedictine and my salary was $225,000.  Had I remained at Bradley, I would have reasonably earned $284,710.  My loss for calendar year 2019 was $59,710.

23. In 2020 my salary at Benedictine is again $225,000.   Had I remained at Bradley, I would have reasonably earned $284,710.  My loss for calendar year 2020 will be $59,710.

24. My intention was to remain at Bradley until the end of the 2022-2023 school year.  My date of birth is January 7, 1956.  In May of 2023 I would be nearing 67 ½ years of age.  This is the age I had intended to retire.

25. It is possible that I would have left Bradley for another position.  However, in order for me to consider accepting a different position I would have had to have earned more than I was earning at Bradley.  I would not have left Bradley for a position that would have paid me less.

26. For calendar year 2021 and 2022, my loss each year will be $59,710.  This number is based upon my Bradley salary of $284,710 and my Benedictine salary of $225,000.

27. As noted above, my intention was to retire in May of 2023. This means I would have worked 5 months in 2023. With an annual salary differential of $59,710, my differential for five months would be $24,879.17.

28. I have prepared the following table that outlines my wage losses in the past and moving forward:

| Year | Lost Wages | Discount Rate* | Time Period | Discount Factor | Present Value |
|---|---|---|---|---|---|
| 2018 | $106,617.08 | 9% | -2 | 1.188 | $126,671.76 |
| 2019 | $59,710 | 9% | -1 | 1.090 | $65,083.90 |
| 2020 | $59,710 | 9% | 0 | 1.000 | $59,710.00 |
| 2021 | $59,710 | 9% | 1 | .917 | $54,779.82 |
| 2022 | $59,710 | 9% | 2 | .842 | $50,256.71 |
| 2023 | $24,879.17 | 9% | 3 | .772 | $19,211.28 |
| | | | | **Total** | **$375,713.47** |

*Discount Rate is the 91 Day Treasury Bill Rate as of 10/22/2020*

29. Based upon the foregoing calculations, I am seeking to be paid $375,713.47 in lost wages. This represents the wage differential between what I will be paid at Benedictine vs. what I would have been paid at Bradley, reduced to present value.

30. At both Bradley and Benedictine I have participated in a 403(b) retirement plan. I have always had enough deducted from my wages so that either university would pay me the maximum match. In recent years I have always contributed the maximum amount allowable.

31. Through both Bradley and Benedictine my 403(b) plan is through The Teachers Insurance and Annuity Association of America-College Retirement Equities Fund (TIAA).

32. Information regarding TIAA is publically available at www.tiaa.org.

33. While I was employed at Bradley the employer match was 5% of my salary (App. 35). Conversely, at Benedictine the employer match is 3% of my salary (App. 30).

34. In 2018, while I was employed at Bradley, Bradley contributed 5% of my salary towards my 403(b) account. As noted at paragraph 21, my lost wages for 2018 were $106,617.08. My lost Bradley contribution for 2018 equals $5,330.85.

35. The amount that I could contribute to my 403(b) account was limited by the fact

that my income was decreased. My contribution in 2017 was $14,133.53. My contribution in 2018 was $10,285.05 and was limited because I could only contribute a certain portion of my income, which had been diminished.

36. Had I continued to be employed at Bradley at $284,710, Bradley would have continued to contribute 5% as its portion on an annual basis. The annual contribution would have been $14,235.50.

37. At Benedictine I earn $225,000 per year and my employer contributes 3% for a total contribution of $6,750.

38. For calendar years 2019 through 2022 I will lose $7,485.50 in annual employer contributions to my 403(b) account.

39. I plan to retire in May of 2023. For that year the lost contribution will be $3,118.96 (5 months prorated).

40. I have prepared the following table that outlines my retirement income losses in the past and moving forward:

| Year | Lost Contribution | Discount Rate* | Time Period | Discount Factor | Present Value |
|---|---|---|---|---|---|
| 2018 | $9,179.33 | 7.19419% | -2 | 1.149 | $10,547.60 |
| 2019 | $7,485.50 | 7.19419% | -1 | 1.072 | $8,024.02 |
| 2020 | $7,485.50 | 7.19419% | 0 | 1.000 | $7,485.50 |
| 2021 | $7,485.50 | 7.19419% | 1 | .933 | $6,983.12 |
| 2022 | $7,485.50 | 7.19419% | 2 | .870 | $6,514.46 |
| 2023 | $3,118.96 | 7.19419% | 3 | .812 | $2,532.19 |
| | | | | Total | $42,086.89 |

41. The Discount rate is slightly different for the retirement benefits. The discount rate is factored by looking at the actual performance of the TIAA account. A copy of the annualized rate of return for those is found in the appendix (App. 31). Ultimately the formula works out as follows:

| | |
|---|---|
| TIAA Rate of Return 2017 | 1.129 |
| TIAA Rate of Return 2018 | 0.9819 |
| TIAA Rate of Return 2019 | 1.111 |
| FV = | 1.231615826 |

$$PV=1, n=3, pmt=0$$

Annualized Rate of Return   7.19419%

42. My lost retirement benefits, reduced to present value, are $42,086.89.

43. The medical benefits that are provided at Bradley and Benedictine are comparable, however, the cost is different. At Bradley my monthly cost was $337.56 for my medical benefits (App. 45). At Benedictine, however, my monthly cost has increased to $686.98 (App. 28 shows the semimonthly deduction).

44. The annual yearly cost for medical benefits at Bradley was $4,050.72. My annual cost for medical benefits at Benedictine is $8,243.76. The annual differential is $4,193.04.

45. I have prepared the following table that outlines my additional costs associated with medical benefits in the past and moving forward:

| Year | Cost Difference | Discount Rate* | Time Period | Discount Factor | Present Value |
|---|---|---|---|---|---|
| 2018 | No loss | 9% | n/a | n/a | $0 |
| 2019 | $4,193.04 | 9% | -1 | 1.090 | $4,570.41 |
| 2020 | $4,193.04 | 9% | 0 | 1.000 | $4,193.04 |
| 2021 | $4,193.04 | 9% | 1 | .917 | $3,846.83 |
| 2022 | $4,193.04 | 9% | 2 | .842 | $3,529.20 |
| 2023 | $1,747.10 | 9% | 3 | .772 | $1,349.08 |
| *Discount Rate is the 91 Day Treasury Bill Rate as of 10/22/2020 | | | | Total | $17,488.56 |

46. My total additional costs for healthcare benefits, reduced to present value, is $17,488.56. This is based upon the costs that I would have paid at Bradley vs. what I am and will continue to pay at Benedictine.

47. While I was at Bradley, effective October 1, 2017, Bradley afforded employees a choice between two competing benefits. The first benefit was that it would increase its contribution rate to the 403(b) plan by an additional 2% per year. Given my salary of $284,710, this would have resulted in an increased benefit to my retirement of $5,694.02 per year.

48. The second option that was afforded to Bradley employees was one that was already in effect. That was the participation in a post retirement health benefit.

49. The two options that were presented our outlined in the appendix (App. 32-44).

50. The second option provided that I could enroll in a medicare supplemental plan during retirement (App. 38). Under that benefit, Bradley would be responsible for paying 50% of the supplemental plan costs (App. 40).

51. My decision was to elect the medicare supplemental plan.

52. As part of the Court's powers to award equitable relief, I am requesting that the Court enter an order directing that Bradley allow me to participate in the supplemental plan as if I remained an employee.

53. As a result of accepting my position at Benedictine, we had to sell our home in Peoria and move to the Chicago area.

54. We incurred costs associated with the move that we would not have incurred had I remained at Bradley. The costs included payment to U-Haul in the amount of $353.31 (App. 56 & 57); packing costs from A Tailored Home in the amount of $1,471.00 (App. 58 & 59); and Moving expenses from Federal Moving Company in the amount of $3,926.26 (App. 55).

55. The total moving costs that we incurred were $5,750.57. Benedictine reimbursed my moving expenses up to $5,000. Ultimately I had to pay $750.57 out-of-pocket in moving expenses.

56. During the discovery and trial phase of the trial I had to travel from my home in the Chicago area to Peoria. The total mileage costs that I incurred for those trips was $513.56. The detail on that amount is included in the appendix (App. 61).

57. I also incurred expenses during the trial that I would not otherwise have incurred. These included the costs for a hotel in Peoria during the trial and the costs for parking. The hotel costs were $630.16 (App. 60) and the parking costs were $49.00 (App. 62-63). The total travel expenditures were $679.16.

58. I am seeking a total award for damages as follows:

| | |
|---|---|
| Back pay through calendar year 2020 | $251,465.66 |
| Front pay from January 1, 2021 through May 31, 2023 | $124,247.81 |
| Reimbursement of lost medical benefits through 2020 | $8,763.45 |
| Compensation for medical benefits that will be incurred after 2020 | $8,725.11 |
| Lost pension benefits through 2020 | $26,057.12 |
| Pension benefits that will be lost after 2020 | $16,029.77 |
| Moving expenses incurred | $750.57 |

Travel expenses incurred $1,192.72

59. The total damages award I am seeking is $437,232.20.

60. In addition to the damages that I am seeking, I am also requesting that the Court direct that Bradley allow me to participate in post-retirement medicare supplement program described above.

61. I have prepared this damages calculation by relying upon the documents that are attached and included in this appendix. The documents that are attached are accurate and genuine copies of the documents.

62. This affidavit is based upon my own personal knowledge and if I were called to testify I could competently testify to all of the matters asserted herein.

63. As part of the appendix to this affidavit I have included my most recent short form CV (App. 65-69).

On my oath and under the penalty of perjury, I state that the above statements are true and correct.

/s/ *Darrell Radson*
Darrell Radson

Dated: NOVEMBER 20, 2020