UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

| | |
|---|---|
| DARRELL RADSON, <br><br> Plaintiff, <br><br> v. <br><br> BRADLEY UNIVERSITY, <br><br> Defendant. | Case No. 18-1374 |

ORDER

This matter is before the Court on Plaintiff's Motion to Amend Judgment under Rule 59(e) (#46-#47). Bradley University filed a Response (#48) objecting to Plaintiff's Motion to Amend Judgment. Plaintiff filed a Reply Brief (#51) in support of his initial motion. For the reasons explained below, Plaintiff's Motion to Amend Judgement is DENIED.

I.  Introduction

At trial, Plaintiff Dr. Darrell Radson ("Radson") claimed that Bradley University retaliated against him in violation of Title VII of the Civil Rights Act of 1964. Specifically, Radson alleged that he was fired from his position as Dean of the College of Business at Bradley University because he raised concerns that the College of Business was discriminating on the basis of national origin during a search for a new professor. Throughout the litigation and trial, Bradley University denied this, and asserted that Radson was terminated to avoid a faculty vote of no confidence.  A jury trial was held. The jury found that Bradley University was liable for retaliation under Title VII. (Verdict

1

Form #38, p. 1). The jury awarded Radson $0.00 in compensatory damages and $40,000 in punitive damages. (Verdict Form #38, p. 1).

Radson argues the jury's verdict should be amended to address his economic damages (i.e. back pay, front pay, medical benefits, pension benefits, moving expenses, and travel expenses). (Radson Br. #47, p. 1). Radson asks the Court to award him the benefits and wages he lost from his unlawful termination. In response, Bradley University argues that Radson is not entitled to economic damages.

## II. Background[1]

### A. Back Pay, Front Pay, & Other Damages

In support of this Motion, Radson submitted his affidavit and documents. The Court also has available the entire record from both the trial and the submissions on the motions for summary judgment. An additional evidentiary hearing is therefore unnecessary.

In 2017, Radson signed an annual contract to be the Dean of Bradley University's College of Business from June 1, 2017 through May 31, 2018. The contract required Bradley to pay Radson $284,710 for his services. (Declaration of Darrell Radson #47-1, p. 2). After Radson was fired as Dean of the College of Business on January 26, 2018, he was hired as a full-time faculty member, which paid him a salary of $158,570, effective August 13, 2018. (Declaration of Darrell Radson #47-1, p. 2). For the remainder of the 2017-2018 academic year (i.e. January 26, 2018, until May 31, 2018), Radson was paid his Dean's salary. (Declaration of Darrell Radson #47-1, p. 2-3). He was not paid for months June and July or the first half of August. For 2018, in total, Bradley paid Radson $178,092.92. (Declaration of Darrell Radson #47-1, p. 2-3). Radson testified at trial that he intended to stay at Bradley University as Dean until May 2023. (Declaration of Darrell Radson #47-1, p. 3).

On September 18, 2018, Radson entered into an agreement with Benedictine University to become Dean of its College of Business effective January 1, 2019.

---

[1] For a more thorough summary of the evidence at trial, see the Court's Order relating to Defendant's Motions pursuant to Rules 50 and 59.

(Declaration of Darrell Radson #47-1, p. 3). Benedictine University agreed to pay Radson $225,000 a year for his services. (Declaration of Darrell Radson #47-1, p. 3). Radson submitted his resignation letter on October 4, 2018, intended to be effective December 31, 2018.

Radson argues he is entitled to back pay, front pay, and lost interest to remedy his lost wages from 2018-2023.[2] The chart below contains Radson's claim for lost wages, excluding Radson's claim for prejudgment interest.

| Year | Radson's Lost Wages Claims |
|---|---|
| 2018 | $106,617.08 |
| 2019 | $59,710 |
| 2020 | $59,710 |
| 2021 | $59,710 |
| 2022 | $59,710 |
| 2023 | $24,879.17 |

Radson also argues he is entitled to recover the difference in retirement benefits from Bradley University and Benedictine University. Radson noted that he contributed 5% of his salary at Bradley University to his 403(b) and Bradley University provided a matching 5% contribution. In 2018, Radson's salary was reduced because of his termination as Dean and transfer to a full-time professor. Bradley University still provided a 5% matching contribution for his reduced salary.

Additionally, from 2019-2023, Radson will earn a lower salary at Benedictine University, and Benedictine University only provides a 3% matching contribution. The chart below contains Radson's claim for lost retirement contributions, without interest.

---

[2] For the purposes of this motion, Radson argues his salary would have remained at $284,710 at Bradley University and $225,000 at Benedictine University from 2018-2023. (Declaration of Darrell Radson #47-1, p. 4).

| Year | Lost Retirement Contribution |
|---|---|
| 2018 | $9,179.33 |
| 2019 | $7,485.50 |
| 2020 | $7,485.50 |
| 2021 | $7,485.50 |
| 2022 | $7,485.50 |
| 2023 | $3,118.96 |

Third, Radson argues that he is entitled to damages that reflect the increased costs of his medical benefits. Radson argues the health benefits between Bradley University and Benedictine University are comparable, but the costs of the medical benefits are different. Additionally, Radson argues the Court should award him injunctive relief and order Bradley University to add Radson to its medical supplemental plan. (Declaration of Darrell Radson #47-1, p. 7). The chart below contains Radson's claim for increased medical costs.

| Year | Increased Medical Benefits Cost |
|---|---|
| 2018 | $0.00 |
| 2019 | $4,193.04 |
| 2020 | $4,193.04 |
| 2021 | $4,193.04 |
| 2022 | $4,193.04 |
| 2023 | $1,747.10 |

Lastly, Radson requests the Court award him additional damages to make him whole. Specifically, Radson requests the Court award him $750.57 in unreimbursed moving expenses, $513.56 for mileage reimbursement related to travel to Peoria for his deposition and trial, and $679.16 for his hotel and parking expenses during trial. (Declaration of Darrell Radson #47-1, p. 7). Altogether, Radson asks for back pay, front pay, medical benefits, retirement benefits, travel expenses, moving expenses and interest totaling $433,598.12. (Declaration of Darrell Radson #47-1, p. 8).

III. **Economic Damages**

Prior to trial, both parties agreed that the issue of economic damages (i.e. back pay, front pay, and benefits) is equitable and should be decided by the court rather than the jury. (Final Pretrial Order #32, p. 2); (Radson Br. #42, p. 1); (Bradley Univ. #48, p. 1).

    **A.**    **Back Pay**

"The district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997) (analyzing back pay awards in the context of a Title VII discrimination claim); *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003); *Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018). Once Plaintiff establishes a violation of Title VII "there [is] a strong presumption that [Plaintiff] [is] entitled to a back pay award on the basis of what [Plaintiff] would have earned absent the discrimination." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997); *see also David v. Caterpillar, Inc.*, 324 F3d 851, 865 (7th Cir. 2003). When awarding backpay, the Court "must respect the findings implied by the jury's verdict, but is otherwise vested with broad discretion to fashion a remedy for unlawful discrimination." *Ortega v. Chicago Board of Education*, 280 F. Supp.3d 1072, 1077 (N.D. Ill. 2017) (internal citations omitted) (citing *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 500 (7th Cir. 2000)).

For backpay awards, the district court "must do its best to recreate the conditions and relationships that would have existed if the unlawful discrimination had not occurred." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1580 (7th Cir. 1997) (citing *United States v. City of Chicago,* 853 F.2d 572, 575 (7th Cir. 1988)). "Although we agree that the district court has broad discretion to fashion a remedy for unlawful discrimination, that discretion is to locate 'a just result' in light of the circumstances of the particular case." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579-1580 (7th Cir. 1997) (reversing the district court's backpay award to a Title VII victim because the award placed the victim in a better position than if the unlawful termination had not occurred since the victim was going to quit her job to open a Subway sandwich shop at the time she was fired). "The guiding principle in exercising that discretion is that the court 'has not merely the power but the duty to render a decree which will so far as possible eliminate the

discriminatory effects of the past as well as bar like discrimination in the future." *Ortega v. Chicago Board of Education*, 280 F.3d 1072, 1078 (N.D. Ill. 2017).

This case is somewhat unique because uncontested evidence demonstrates that many faculty members wanted Radson terminated for non-discriminatory reasons. Yet, the evidence at trial, when drawing all reasonable inferences in Radson's favor, also supported the jury's finding that Bradley University had retaliated against Radson for engaging in protected activity. In the Court's opinion, this retaliation likely accelerated an otherwise inevitable outcome, which the jury implied through its small damages award.[3]

To determine Radson's backpay award, the district court "must do its best to recreate the conditions and relationships that would have existed if the unlawful discrimination had not occurred." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1580 (7th Cir. 1997) (citing *United States v. City of Chicago,* 853 F.2d 572, 575 (7th Cir. 1988)). To achieve this end, the Court will examine Radson's relationships with Bradley University's faculty and administration to determine how long Radson likely would have remained at Bradley University if he had never complained about possible national origin discrimination during the selection process.

### 1. Radson's Relationships with Faculty Members

The evidence shows that Radson had poor relationships with the College of Business faculty. In March 2016, the Faculty Third Year Assessment of the Dean of the Foster College of Business and the Executive Committee Third Year Assessment of the Dean were completed. According to the survey summary, "the Dean was rated by faculty on six dimensions of leadership, using 1-5-point scales." (Plaintiff's Trial Ex. 6, p. 2) "The four questions [that] focused on perceived effectiveness in working with the faculty inside the College . . . had mean scores below the 3.0 scale midpoint." *Id.* This was "Below Expectations." *Id.* While the comments themselves varied, the apparent majority of

---

[3] The jury returned a verdict of $0.00 in compensatory damages $40,000 in punitive damages. This is small compared to Radson's testimony that he was paid more than $280,000 per year.

comments were negative about his leadership.[4] For example, one faculty member stated that "[t]his Dean has been a disaster." (Plaintiff's Trial Ex. 6, p. 11). Another faculty member stated:

> I do not feel comfortable being alone in a room with Dean Radson. Both because he has promised me things that he later refuses to admit to agreeing to & because his hostile behavior make[s] me nervous for my safety.

(Plaintiff's Trial Ex. 6, p. 60). Another faculty member commented:

> The dean doesn't really listen or care about what faculty members think. He uses bullying tactics in meetings and in calling faculty into his office. Morale is at an all-time low. I have never worked under a "great" dean but I have never worked under one this bad before.

(Plaintiff's Trial Ex. 6, p. 60). When asked how the Dean's performance could be improved, at least two survey respondents were calling for him to leave. (Plaintiff's Trial Ex. 6, p. 56, 59).

By January, 2018, the faculty was calling for a no confidence vote. On January 24, 2018, President Roberts held a meeting attended by Provost Zakahi and the six department chairs at the College of Business to discuss Radson and the anticipated "no confidence" vote in his leadership. All six of the College of Business's department chairs attended the meeting. Those in attendance were: (1) Accounting Chair Dr. Stephen Kerr, (2) Economics Chair Dr. Joshua Lewer, (3) Finance Chair Dr. Jannett Highfill, (4) Management and Leadership Chair Dr. Ross Fink, (5) Entrepreneurship, Technology, and Law Chair Dr. Matthew McGowan, and (6) Marketing Chair Dr. Edward Bond. (Dep. Darrell Radson, #16-1, p. 13).[5] These six chairs represented all 25-30 faculty members of Bradley University's College of Business. During the meeting, the six chairs <u>unanimously recommended</u> that Radson be removed from his position as Dean and opined that a no-

---

[4] The survey is not completely negative. A few faculty members expressed positive opinions of Radson.
[5] The accounting department is the largest department with seven tenured or tenured-track professors. (Dep. Darrell Radson #16-1, p. 13). Additionally, the smallest department is the Entrepreneurship, Technology, and Law Department with four tenured or tenured-track professors. (Dep. Darrell Radson #16-1, p. 13).

7

confidence vote could not be avoided. (Dep. Dr. Joshua Lewer #17-2, p. 6); (Dep. Dr. Jannett Highfill, #17-3, p. 7-8); (Dep. Darrell Radson #16-1, p. 13); (Dep. President Roberts #17-1, p. 14-5). Radson was terminated as Dean two days later.

### a. President Gary Roberts

President Gary R. Roberts testified at trial and in a deposition about the problems the University had with Dean Radson. President Roberts testified that Radson could be argumentative, abrasive, and demeaning. (Dep. President Roberts #17-1, p. 6, 14). President Roberts listed specific examples of the stories the six chairs provided him about Radson's behavior. For example, a faculty member once made an argument with which Radson disagreed and Radson sprayed aerosol in the air to "[k]ill off that crazy idea." (Dep. President Roberts #17-1, p. 14). In another example, when Radson wanted to show he disagreed with one of Bradley University's policies or traditions, he would pick up a bottle of red Gatorade or Powerade and state: "[W]ell, let's drink the Bradley Kool-Aid again."[6] (Dep. President Roberts #17-1, p. 6). According to President Roberts, the faculty's breaking point came when Radson accused Professor Weinzimmer and Professor Robin of unethical behavior in front of other faculty members.[7] (Dep. President Roberts #17-1, p. 14).

President Roberts further testified that these problems had existed since before he became President of Bradley University. He was told that people around town did not like Radson, and that Radson often spoke poorly of the University.

As for the impending "no confidence" vote, President Roberts testified that the six chairs told him that it would be fruitless to try to persuade the faculty members to cancel the "no confidence" vote. (Dep. President Roberts #17-1, p. 14). President Roberts stated the six chairs were very clear that the "no confidence" vote was going to pass by a "strong

---

[6] The colors that represent Bradley University in athletic competition are white and red. This was only one of the ways Radson would "make fun" of Bradley University.

[7] These are just a few examples. President Roberts detailed other instances of Radson getting into verbal arguments with other people at Bradley University. Multiple people also testified that Radson yelled at President Roberts at a meeting where Bradley University's Senate was considering whether to award posthumous degrees to students that died while attending Bradley University. (Dep. President Roberts #17-1, p. 9); (Dep. Dr. Matthew O'Brien #17-5, p. 6).

8

majority" of the faculty who wanted Radson removed as dean. (Dep. President Roberts #17-1, p. 14).

### b. Provost Walter Zakahi

Provost Zakahi testified that he received many complaints about Radson's behavior from other administrators at Bradley University. (Provost Walter Zakahi's Dep. #16-3, p. 14). For example, the Chief Financial Officer of Bradley University, Gary Anna, and Radson had professional disagreements about how Bradley University's budget was created. (Provost Walter Zakahi's Dep. #16-3, p. 14). Additionally, Provost Zakahi received complaints from Chris Jones, the Dean of the College of Liberal Arts and Science, and Vice President Jacob Heuser regarding Radson's behavior and attitude. (Provost Walter Zakahi's Dep. #16-3, p. 14). Moreover, Provost Zakahi received complaints about Radson acting rude when Dean Jeffrey Huberman would give lengthy speeches at meetings attended by administrators. (Provost Walter Zakahi's Dep. #16-3, p. 14). Specifically, Radson would dramatically frown or bend over and put his face in his hands during Dean Huberman's long speeches.[8] (Provost Walter Zakahi's Dep. #16-3, p. 15).

Provost Zakahi also testified about an instance in which Radson was disrespectful toward President Roberts. In front of the University Senate, Radson become visibly and audibly angry at President Roberts during a debate and "for a moment lost control of himself." (Provost Walter Zakahi's Dep. #16-3, p. 15). Provost Walter Zakahi testified that Radson began yelling at President Roberts about awarding post-humous degrees to dead students. (Dep. Provost Walter Zakahi #16-3, p. 15). Provost Zakahi had a conversation with Radson about Radson losing his temper after this incident. (Dep. Provost Walter Zakahi #16-3, p. 15).

As for the "no confidence" vote, Provost Zakahi's plan was to convince the six chairs to delay the vote and give him time to work with Radson to fix his communication issues. During the meeting, the six chairs of the College of Business listed many non-discriminatory reasons they believed a "no confidence" vote in Radson's leadership

---

[8] Provost Zakahi took Radson aside on this issue and asked Radson to show a little more patience with Dean Huberman. (Provost Walter Zakahi's Dep. #16-3, p. 15).

needed to be held. The faculty notified Provost Zakahi that Radson recently screamed at the entire faculty through a microphone during a meeting.[9] (Dep. Provost Zakahi #16-3, p. 31). The six chairs also stated that Radson would bully various faculty members. (Dep. Provost Zakahi #16-3, p. 30). Moreover, five of the six chairs informed Provost Zakahi they believed there was no way to stop the "no confidence" vote in Radson's leadership.[10] (Provost Walter Zakahi's Dep. #16-3, p. 31). By the end of this meeting, Provost Zakhahi concluded he had no option other than to ask Radson to resign. (Provost Walter Zakahi's Dep. #16-3, p. 32).

### c. Aaron Buchko, Head of Selection Committee

Dr. Aaron Buchko provided testimony on his relationship with Radson.[11] Dr. Buchko testified that he supported the "no confidence" vote because Radson expressed a lack of trust and respect for Dr. Weinzimmer, Dr. Robin, and the three members of the Hiring Committee (i.e., Dr. Aaron Buchko, Dr. Mark Brown, and Dr. Heidi Baumann). (Dep. Dr. Aaron Buchko #17-4, p. 3). Dr. Buchko testified that Radson accused them of manipulating the hiring process to select a particular candidate. (Dep. Dr. Aaron Buchko #17-4, p. 4). Dr. Buchko testified that he met with Provost Zakahi in January 2018, and Provost Zakahi requested that Dr. Buchko use his influence to delay the vote so Provost Zakahi would have a chance to work with Radson to improve his performance. (Dep. Dr. Aaron Buchko #17-4, p. 4).

### d. Stephen Kerr, Accounting Chair

Dr. Kerr testified at trial but no deposition transcript was submitted into the record. Dr. Kerr testified that, based on his conversations with the Accounting faculty, he believed the "no confidence" vote would pass.

### e. Ross Fink, Management and Leadership Chair

---

[9] Radson explained at trial that he was suffering from laryngitis and had not lost his temper.
[10] Jannett Highfill indicated that she would try to convince the faculty members in her department to not hold the vote, but she also indicated that she was not confident she would be successful. (Provost Walter Zakahi's Dep. #16-3, p. 31).
[11] It should be noted that Dr. Buchko is the person to whom Radson attributes the discriminatory motive that led to Radson's ultimate termination.

10

Dr. Fink testified at trial but no deposition transcript was submitted into the record. He testified that he did not believe that the chairs could stop a "no confidence" vote and that it would likely pass if called. Dr. Fink also provided examples of why he believed that "enough was enough" and it was time to move on from Dean Radson.

### f. Edward Bond, Marketing Chair

Dr. Bond testified at trial but no deposition transcript was submitted into the record. Like the others, he testified that the "no-confidence" vote would proceed and that it would pass.

### g. Matthew McGowan, Entrepreneurship, Technology, and Law Chair

Dr. McGowan testified at trial but no deposition transcript was submitted into the record. At trial, he testified that the "no-confidence" vote would proceed and that, after discussing with the faculty in his department, he believed it would pass. He also stated that, "None of the folks in my department were happy with him."

### h. Joshua Lewer, Economics Chair

Dr. Lewer testified at trial and during a deposition. Dr. Lewer testified that he worked in academics for twenty years and there was more conflict with Radson than with any of the other deans with whom Dr. Lewer had previously worked. (Dep. Dr. Joshua Lewer #17-2, p. 4). Additionally, Dr. Lewer testified that Radson would "make fun" of Bradley University's policies when Radson's policy proposals would be rejected by the administration.[12] (Dep. Dr. Joshua Lewer #17-2, p. 5). Moreover, Dr. Lewer testified that Radson would fight with *anybody*, including Bradley University's Senate, other deans at Bradley University, and other members of Bradley University's administration. (Dep. Dr. Joshua Lewer #17-2, p. 5). Dr. Lewer testified that Radson confided in him that Radson

---

[12] Radson's habit of "making fun" of Bradley University was particularly offensive to Bradley University's faculty because the members of the faculty are proud to be associated with Bradley University. Bradley University hires a large number of candidates that studied at Bradley University such as President Gary Roberts, Provost Walter Zakahi, Dr. Aaron Buchko, and Dr. Larry Weinzimmer. Radson did not attend Bradley University as a student, and Radson did not like that Bradley University would frequently hire its former students.

was worried about his job security because he got into verbal disagreements with Provost Zakahi and the upper administration at Bradley University. (Dep. Dr. Joshua Lewer #17-2, p. 8).

Dr. Lewer also provided testimony about the January 24th chair meeting. Dr. Lewer testified that the Accounting Chair Dr. Stephen Kerr was the most adamant of all the chairs on Radson's removal. (Dep. Dr. Joshua Lewer #17-2, p. 7). Additionally, Dr. Lewer testified that the Marketing Chair Dr. Edward Bond was the second most adamant chair on Radson's removal. (Dep. Dr. Joshua Lewer #17-2, p. 7). Dr. Lewer also recommended that Radson be removed from his position as Dean during that meeting. (Dep. Dr. Joshua Lewer #17-2, p. 6). This is particularly relevant because none of them were involved in the hiring process that led to Radson's termination.

At the January 24th meeting, Provost Zakahi suggested that perhaps Radson could be rehabilitated with sensitivity training. (Dep. Dr. Joshua Lewer #17-2, p. 6). One of the chairs rejected the offer and responded that Radson "couldn't change." (Dep. Dr. Joshua Lewer #17-2, p. 6).

### i. Jannett Highfill, Finance Chair

Dr. Jannett Highfill provided deposition testimony but did not testify at trial. Dr. Highfill testified that multiple finance professors expressed concerns to her about Radson's leadership, describing him as extremely angry and unhappy. (Dep. Dr. Jannett Highfill, #17-3, p. 4-5). Additionally, Dr. Highfill testified that all six chairs were critical of Radson's leadership during the January 24th meeting.[13] (Dep. Dr. Jannett Highfill, #17-3, p. 7). Like the other chairs, Dr. Highfill recommended that Radson be removed at the January 24th meeting. (Dep. Dr. Jannett Highfill, #17-3, p. 7-8).

### j. Associate Dean Dr. Matthew O'Brien

Dr. Matthew O'Brien testified in a deposition. He was appointed the Associate Dean of the College of Business by Radson, and he was the Associate Dean when Radson

---

[13] Dr. Highfill also testified that the Accounting Chair, Marketing Chair, and Entrepreneurship, Technology, and Law Chair were highly critical of Radson's leadership. (Dep. Dr. Jannett Highfill, #17-3, p. 7, 9).

12

was fired. (Dep. Dr. Matthew O'Brien, #17-5, p. 4). Dr. O'Brien was (even according to Radson's trial testimony) a supporter of Radson. He opposed the "no confidence" vote and tried to discourage the faculty from calling for the "no confidence" vote. (Dep. Dr. Matthew O'Brien, #17-5, p. 12, 14).

Nevertheless, Dr. O'Brien had personal concerns with Radson's communication style. (Dep. Dr. Matthew O'Brien, #17-5, p. 5). Specifically, Dr. O'Brien testified that Radson would raise his voice, become demonstrative, speak over people, and occasionally insult people. (Dep. Dr. Matthew O'Brien, #17-5, p. 5). In fact, Dr. O'Brien got into a verbal argument with Radson in their very first meeting. (Dep. Dr. Matthew O'Brien, #17-5, p. 5).

Dr. O'Brien provided testimony regarding the search for a new professor in the Management and Leadership Department. Dr. O'Brien testified that Dr. Weinzimmer and Dr. Buchko both expressed that they were personally insulted by Radson. (Dep. Dr. Matthew O'Brien, #17-5, p. 6). Dr. O'Brien stated he believed Radson's accusations were borderline unprofessional because Radson made these accusations without clear evidence. (Dep. Dr. Matthew O'Brien, #17-5, p. 6).

According to Dr. O'Brien, Radson held a contentious 60 to 90-minute meeting with the Management & Leadership faculty members in November 2017. This meeting was attended by: (1) Dr. Larry Weinzimmer, (2) Dr. Aaron Buchko, (3) Dr. Ross Fink, (4) Dr. Heidi Baumann, (5) Dr. Mark Brown, (6) Dr. Jennifer Robin, (7) Associate Dean Matthew O'Brien, and (8) Dean Darrell Radson. (Dep. Associate Dean Matthew O'Brien #17-5, p. 8-9); (Dep. Darrell Radson #16-1, p. 25). At this meeting, Radson accused: (1) Dr. Aaron Buchko of unethical behavior for failing to follow the College of Business hiring procedures; (2) Dr. Weinzimmer of unethical behavior for conducting interviews while not being on the search committee and for being listed as a reference for one of the candidates, Dr. Candace Esken; and (3) Dr. Jennifer Robin of unethical behavior for being listed as a reference for Dr. Candace Esken. (Dep. Associate Dean Matthew O'Brien #17-5, p. 9-10). Lastly, Associate Dean O'Brien testified that Radson did not bring up

discrimination on the basis of national origin at this meeting. (Dep. Associate Dean Matthew O'Brien #17-5, p. 9).

### k. Dr. Jennifer Robin & Dr. Larry Weinzimmer

Dr. Larry Weinzimmer and Dr. Jennifer Robin did not testify at trial, and neither party submitted a deposition for these witnesses into the record. However, witnesses discussed Radson's relationship with them.

In December 2017, President Roberts was informed that these professors intended to leave Bradley University because they could no longer work with Radson. Dr. Weinzimmer and Dr. Robin wanted to leave Bradley University because Radson accused them of unethical conduct in front of their colleagues. Specifically, Radson accused Dr. Weinzimmer of corrupting the hiring process for a new professor by trying to force the hiring of Dr. Weinzimmer's preferred candidate. Additionally, Radson accused Dr. Robin of having a conflict of interest in the hiring process because she was listed as a reference for her preferred candidate. Radson stated that he had concluded that the hiring process had been "corrupted" and he felt duped by the faculty in Management and Leadership Department.

> **2. Radson's poor relationships with Bradley University's administration and faculty would have led Bradley University to decline to renew his contract as Dean on May 31, 2018.**

All this evidence leads to the inevitable conclusion that Radson was on the verge of being terminated at the time of the retaliatory conduct, which likely accelerated his termination. Radson's relationships with Bradley University's employees were poor. He had almost no supporters within the University, and all six department chairs testified that they either wanted him gone or were unwilling to support him. Based on this information, and in an attempt to "recreate the conditions and relationships that would have existed if the unlawful discrimination had not occurred," the Court concludes that

Bradley University would not have renewed Radson's annual contract at the end of May, 2018, regardless of Radson's objections to purported discrimination. Therefore, Radson is entitled to backpay from January 26, 2018, until the end of his contract, May 31, 2018. However, because Bradley University paid Radson through the end of his contract, the Court awards no back pay. (Declaration of Darrell Radson #47-1, p. 2-3).

The evidence establishes the vast majority of the 25-30 tenured-track or tenured faculty members wanted Radson removed for reasons *completely separate* from his opposition to discrimination on the basis of national origin. The Court notes five of the six department chairs took no part in the search process for a new professor, and these five department chairs unanimously recommended that Radson be removed from his position.[14] Additionally, it appears Radson was strongly disliked by the faculty at the College of Business because: (1) Radson engaged in *countless* verbal disputes with Bradley University's President, Provost, administrators, consultants, and faculty; (2) Radson would frequently insult Bradley University employees and Bradley University as an institution in his verbal disputes with his colleagues; and (3) Radson lacked empathy for faculty members, seemingly bullying people at times.

The faculty's disapproval of Radson was *deep* and *widespread*, and predated the search that led to Radson's protected speech. The faculty strongly disapproved of Radson's leadership, and witnesses provided many examples of their experiences with Radson. It is also important to note that: (1) the faculty was willing to directly and publicly criticize their boss; (2) the faculty was willing to bring bad publicity to Bradley University and the College of Business through the "no confidence" vote even though the faculty thought highly of Bradley University; and (3) a department chair rejected Provost Zakahi's proposal of sensitivity training for Radson because the chair believed Radson "couldn't change."

Moreover, President Roberts testified that distinguished professors were threatening to leave the University if Radson was not removed as Dean. Specifically, Dr.

---

[14] The sixth department chair, whose department participated in the search for the new professor, also recommended that Radson be removed as Dean of the College of Business.

Robin and Dr. Weinzimmer told President Roberts they were planning to leave because of the way that Radson had treated them. Importantly, Radson's accusations against Dr. Robin and Dr. Weinzimmer are *not* legally sufficient to constitute Title VII retaliation on the basis of national origin discrimination. Radson himself did not plead Title VII retaliation allegations against Dr. Robin or Dr. Weinzimmer. Radson's accusations against Dr. Robin and Dr. Weinzimmer were separate and distinct from his accusations against the search committee. Although both Dr. Robin and Dr. Weinzimmer had roles in the process, neither were on the search committee or provided any "fit" ratings for applicants. Instead, Radson accused them of unethical behavior due to a perceived conflict of interest in the search process. He did not accuse them of discrimination.

During Radson's deposition, he listed the five reasons he accused Dr. Weinzimmer and Dr. Robin of unethical conduct during the search process. First, Radson objected to the fact that Dr. Weinzimmer encouraged Radson to quickly hire his preferred candidate, Dr. Candace Esken, before Bradley University's search procedures were complete. (Dep. Darrell Radson, #16-1, p. 21-22). Second, Radson argued Dr. Weinzimmer was breaking Bradley University's rules because Dr. Weinzimmer helped interview candidates for the position even though he was not on the search committee. (Dep. Darrell Radson, #16-1, p. 22). Third, Radson objected that Dr. Weinzimmer and the others only interviewed six or seven applicants at the American Marketing Conference even though there were hundreds of potential candidates at the Conference. (Dep. Darrell Radson, #16-1, p. 22). Fourth, Radson alleged that Dr. Weinzimmer and Dr. Robin had a conflict of interest because they both were listed as references for their preferred candidate, and Dr. Weinzimmer had authored two papers her. (Dep. Darrell Radson, #16-1, p. 22). Fifth, Radson objected to Dr. Weinzimmer and Dr. Robin's involvement in the search process since they were not on the search committee. (Dep. Darrell Radson, #16-1, p. 23). None of these five accusations pertain to discrimination on the basis of national origin.

Moreover, Radson did not provide a theory of how these accusations were protected by Title VII in his Complaint, Motion for Summary Judgment, or any of his post-trial motions. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) ("Pleading

16

a retaliation claim under Title VII requires the plaintiff to allege that she engaged in statutorily protected activity and was subjected to an adverse employment action as a result. The protected activity must be specifically identified."). In fact, none of Radson filings accuse Dr. Robin or Dr. Weinzimmer of committing any action that constitutes discrimination on the basis of national origin. (Complaint #1, p. 3-4) (accusing Bradley University of Title VII discrimination based on the "clear English" comment and the use of "fit" as evaluative criteria); (Radson Summary Judgment Br. #20, p. 5) (stating the reason Dr. Weinzimmer and Dr. Robin were leaving was how the search was handled); (Radson's Summary Judgment Br. #20, p. 33); (Radson Post-Trial Motion #49, p. 7) (accusing Dr. Weinzimmer of pushing the "no confidence" vote without specifying Dr. Weinzimmer's motivation); (Radson Post-Trial Motion #49, p. 6).

A unanimous jury concluded Radson was fired on January 26, 2018, because he opposed discrimination on the basis of national origin. In a separate Order, the Court determined this conclusion was reasonable when drawing all inferences in Radson's favor. Regardless, the evidence also clearly shows that Radson was about to be terminated even if the retaliatory conduct had not occurred. Radson was strongly disliked by the faculty for reasons that had nothing to do with his protected activity (that is, allegations of discrimination). There is nothing to suggest that Radson would have changed his ways, and testimony included an opinion that he could not be changed. Even if Bradley University administrators could have headed off the January "no-confidence" vote, another would have been forthcoming not long afterward. In the end, nearly all the evidence indicates that Provost Zakahi would have declined to renew Radson's annual contract or terminated his contract before its expiration. Given these facts, the Court will terminate back pay as of the end of his contract, May 31, 2018.

Radson should be awarded backpay for the time from January 26, 2018 to May 31, 2018. This amounts to approximately $94,903.32. Despite that Radson was terminated as Dean in January 2018, Bradley University continued to pay his Dean's salary of $284,701

through the end of his 2017-2018 contract (i.e. until May 31, 2018).[15] (Declaration of Darrell Radson, #47-1, p. 2-3). This is precisely the amount Radson likely would have been paid even had his termination not been accelerated by the retaliatory conduct. *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003) ("The district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole."); *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997) (reversing the district court's backpay award to a Title VII victim because the award placed the victim in a better position than if the unlawful termination had not occurred since the victim was going to quit her job to open a Subway sandwich shop at the time she was fired). Therefore, the Court awards Radson no backpay.

### B. Front Pay

Radson's Motion requests the Court to amend the judgment and award Radson front pay. "Front pay begins when back pay ends (date of judgment) and continues for whatever period of time will make the plaintiff whole." *Ortega v. Chicago Bd. of Educ.*, 280 F. Supp. 3d 1072, 1110 (N.D. Ill. 2017) (citing *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952 (7th Cir. 1998)). "As an equitable remedy, the district court has discretion to decide whether to award front pay." *Ortega v. Chicago Bd. of Educ.*, 280 F. Supp. 3d 1072, 1100 (N.D. Ill. 2017); *See Williams v. Pharmacia, Inc.*, 137 F.3d 944, 954 (7th Cir. 1998) (Front pay awards typically are limited in duration, depending on when the plaintiff did or could "reasonably be expected to have moved on to similar or superior employment."). For the reasons explained above, the Court denies Radson's motion for front pay. The evidence demonstrates that Radson would have been lawfully terminated before front pay would begin.

### C. Retirement & Medical Expenses

District Courts in the Seventh Circuit have indicated that a successful Title VII Plaintiff can recover lost retirement contributions and lost medical benefits. *Gracia v.*

---

[15] Radson states he went without pay for June, July, and August, in 2018, and began receiving his faculty salary in the fall. Radson was paid for 9.5 months in 2018, totaling $178,092.92. (Declaration of Darrell Radson #47-1, p. 2-3).

*Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1260–61 (N.D. Ill. 2015) (analyzing whether the successful Title VII Plaintiff had a sufficient evidentiary basis to recover medical expenses and retirement contributions). Moreover, the Court notes: "The district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997). The Court concludes a successful Title VII Plaintiff may recover retirement benefits and medical expenses.

Radson is entitled to his retirement benefits that he did not receive in 2018. However, it appears from the record that Bradley University paid those benefits through the end of his contract. In 2018, Radson's signed affidavit states Bradley University matched Radson's 5% contribution by contributing $8,904.65 to his retirement. ($178,092.92 * 0.05 = $8,904.65). (Declaration of Darrell Radson #47-1, p. 3-4). Therefore, Radson received the 5% contribution on his 2018 salary to which he was entitled. The Court does *not* award Radson any additional retirement benefits.

Finally, the Court denies Radson's motion for lost health benefits. The Court notes Radson did not claim damages for health benefits for 2018. As the Court previously found that front pay is inappropriate, the Court does *not* award Radson health benefits for 2019-2023. Lastly, for the same reasons, the Court denies Radson's request for an injunction that requires Bradley University to add Radson to its medical supplemental plan.

### D.  Other Damages: Travel, Hotel, Moving, Parking & Interest

Radson requests the Court amend the judgement and award him other damages and interest. Specifically, Radson requests $750.57 in unreimbursed moving expenses, $513.56 for mileage reimbursement related to this litigation, and reimbursement for his hotel and parking expenses for trial of $679.16. (Declaration of Darrell Radson #47-1, p. 7). Additionally, Radson argues that the Court should award him interest for his backpay and retirement-related damages.

The Court denies Radson's request for moving expenses because Radson was going to leave Bradley University because of a lawful termination even if he did not complain of discrimination. As for mileage costs, hotel costs, and parking costs, the motion is also denied. Travel and lodging costs for parties to a litigation are not

19

recoverable. *Kikson v. Underwriters Labs*, 2007 WL 9810956 at *3 (N.D. Ill. January 11, 2007) (stating the "general rule" is that parties may not collect witness fees for travel and lodging under 28 U.S.C. § 1920(3)); *Barber v. Ruth*, 7 F.3d 636, 646 (7th Cir. 1993) ("As a general rule, parties may not normally collect witness fees.") (superseded on other grounds). Finally, with no back pay or costs outstanding, the motion for pre-judgment interest is denied.

## IV.    Conclusion

For the reasons explained above, Radson's Motion to Amend Judgment (#46) is DENIED. The Court would have granted the motion for back pay from January 26, 2018 through the end of Radson's contract, May 31, 2018. However, because Bradley University already paid Radson for this time period, no additional economic damages are owed. Therefore, the Court denies Radson's request for back pay, front pay, retirement benefits, health benefits, Plaintiff's incidental costs, interest and injunctive relief.

ENTERED this <u>29th</u> day of March, 2021.

s/ERIC I. LONG<br>
UNITED STATES MAGISTRATE JUDGE